CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
for Roanoke
NOV 30 2012
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| GARY WALL,<br>    Plaintiff, | ) Civil Action No. 7:11-cv-00191<br>)<br>) |
| v. | ) **MEMORANDUM OPINION**<br>) |
| JAMES WADE, et al.,<br>    Defendants. | ) By:  Hon. Jackson L. Kiser<br>)       Senior United States District Judge |

Gary Wall, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq. Plaintiff names as defendants in both individual and official capacities: T. Ray, former Warden of the Red Onion State Prison ("ROSP"); Robert Rowlette, former ROSP Assistant Warden; J. Stallard, a ROSP Counselor; James Wade, the ROSP Food Services Manager; C. Selyers, a ROSP Food Services Supervisor; and John Garman, a Virginia Department of Corrections ("VDOC") Regional Director. Plaintiff argues that defendants violated his constitutional and statutory right to participate in Ramadan[1] in 2010 after plaintiff did not produce Islamic literature to demonstrate a sincerely held Islamic belief. Defendants filed a motion for summary judgment, and plaintiff responded, making the matter ripe for disposition. After reviewing the record in a light most favorable to plaintiff, I find that defendants are entitled to summary judgment.

---

[1] Ramadan is a month-long, religious fast traditionally observed by Muslims, including adherents of the Nation of Islam, like plaintiff. Ramadan requires Muslims to fast during the day and to eat during the night.

# I.

In 2009, a Muslim inmate at ROSP[2] simply had to sign up to participate in Ramadan, which resulted in about half of the inmate population saying they were practicing Muslims. ROSP staff later determined that many of these inmates were, in fact, not practicing Muslims. Because implementing Ramadan for inmates is costly and disruptive, ROSP officials implemented a new policy in 2010 that allowed inmates to register for Ramadan between June 25 and July 25, 2010, and required each inmate to present religious material to prove being a sincere Muslim.[3] Although 360 inmates, about 48% of ROSP inmates, signed up for Ramadan in 2010, only 176 inmates had some type of Islamic materials to demonstrate religious sincerity. The other 184 applicants were removed from the Ramadan participation list because they did not produce any Islamic materials.

Plaintiff was one of those inmates removed from the 2010 Ramadan list. Plaintiff had signed up for Ramadan on July 1, 2010, and asked to have his Common Fare[4] meals served during the night. On July 30, 2010, Selyers, Wade, and Stallard asked plaintiff to produce evidence of religious sincerity in order to participate in Ramadan. Plaintiff explained that his religious property had been lost during his transfer to ROSP and gave Wade a state-court judgment against the Commonwealth of Virginia as proof that the VDOC lost his religious

---

[2] ROSP is considered an "Administrative Long Term Segregation Unit," meaning that its inmates, except for the cadre-inmate staff, are kept in their cells for approximately 23 hours per day. This type of secure housing is designed for the VDOC's most violent or defiant inmates.

[3] This policy was unique compared to most other VDOC facilities where a Religious Pass List details inmates' participation with specific religious services. Generally, the Religious Pass List of inmates practicing Islam is used to verify the names of inmates signing up to participate in Ramadan. Because most ROSP inmates are in long term administrative segregation, they may not congregate for religious services and ROSP staff could not rely on a Religious Pass List. However, ROSP inmates may request religious items from a Chaplain and may possess religious items, like a Quran, kufi, or prayer rug, in their cells.

[4] Common Fare is a VDOC menu designed to meet the nutritional and religious needs of a wide variety of religious groups, including Muslims. See, e.g., Madison v. Virginia, 474 F.3d 118, 123 (4th Cir. 2006); Acoolla v. Angelone, No. 7:01-cv-01008, 2006 U.S. Dist. LEXIS 62574, at *12-13, 2006 WL 938731, at *4 (W.D. Va. Sept. 1, 2006). VDOC officials must approve an inmate's receipt of Common Fare.

property.[5] Plaintiff explained that he participated in Ramadan in 2008 and 2009 and also showed them that the VDOC approved him to receive Common Fare because of his Islamic beliefs.[6] Wade reviewed the documents; said, "That don't mean anything"; and told Selyers to remove plaintiff from the Ramadan list.

    Plaintiff immediately filed an Informal Complaint, to which Wade responded:

> If a facility does not have religious services for the religious group in question, then religious literature should be obtained from the Chaplain for the offender to read. Ramadan sign up period ended on July 25[, 2010]. [ROSP] does not have religious services so the following rules apply to this institution. You are required to have religious material such as ([][ku]f[i], [Qu]r[a]n, prayer rug or religious pamphlets that pertain to the Ramadan month long fasting.) Food service went to every inmate[']s cell to inspect the above religious material. Either you had no religious material or refused to present material[.] [T]his is why you were removed from the Ramadan pass list.

(Pl.'s attch. (ECF no. 21-1) 8.) Plaintiff appealed this grievance to Warden Ray and Regional Director Garman, who both upheld Wade's response.

    On August 11, 2010, the first morning of Ramadan, plaintiff did not eat breakfast and concealed some of the food in his cell. ROSP security staff found the food later the same day and threatened to charge plaintiff with possessing contraband. Faced with starvation and repeated sanctions for trying to eat during the night, plaintiff ate during the day and violated his religious belief.

    Plaintiff filed a Regular Grievance on August 15, 2010, complaining how he was being forced to violate his religious belief despite receiving Common Fare because he was a practicing Muslim. Assistant Warden Rowlette subsequently approached plaintiff and asked if he wanted

---

[5] The state-court judgment issued on June 28, 2010, was in plaintiff's favor for $97.60. Plaintiff also filed a letter from a Senior Assistant Attorney General, who explained that the judgment would have to be paid by the Department of Corrections "because there were founded grievances regarding th[e] lost property. . . ." (Pl.'s attch. (ECF no. 50-1) 3(b).) Plaintiff does not allege that he showed this letter to Wade.

[6] Plaintiff's cell door also displayed a notice of plaintiff's receipt of Common Fare.

3

to be put back on the Ramadan list if Rowlette could verify that the VDOC lost plaintiff's religious property. Plaintiff responded, "That was my desire to begin with. That's why I met the required deadline, but that does not change nor address my Grievance of being removed off the list for no reason by Wade and Stallard and due to his vague response to my Informal Complaints, to this day I still don't know why I was removed from the Ramadan list in the first place!" (Am. Compl. ¶ 15.) Rowlette replied, "Okay," wrote something on his clipboard, and walked away while plaintiff repeatedly yelled, "I want to participate in Ramadan! I want my Ramadan, Rowlette!"

Warden Ray subsequently considered plaintiff's Regular Grievance as "unfounded." Ray stated that plaintiff told Rowlette, "No, I will pursue this in court," after Rowlette asked if plaintiff wanted to be put back on the Ramadan list. Plaintiff explained in his appeal to Garman that he never said, "No, I will pursue this in court," but Garman upheld Ray's response. Plaintiff was ultimately not allowed to participate in Ramadan in 2010.[7]

Plaintiff argues that defendants violated RLUIPA; the First Amendment of the United States Constitution; Article I, sections 11[8] and 16[9] of the Virginia Constitution; and Virginia Code § 53.1-32(D)[10] by prohibiting his participation in Ramadan in 2010. Plaintiff requests a declaratory judgment, nominal damages, unspecified joint and several compensatory damages,

---

[7] Certain ROSP inmates, including plaintiff, were permitted to "make up" this missed fast between April 2 and May 1, 2012.
[8] Section 11 provides "that the right to be free from any governmental discrimination upon the basis of religious conviction . . . shall not be abridged. . . ."
[9] Section 16 prohibits the Virginia General Assembly from "prescribe[ing] any religious test whatever" and that "all men are equally entitled to the free exercise of religion[.]"
[10] This section reads, "The [VDOC] Director or his designee who shall be a state employee is authorized to make arrangements for religious services for prisoners at times as he may deem appropriate. . . . [and] the final authority for such arrangements shall reside with the Director or his designee."

$10,000 in punitive damages from each defendant, and "[a]ny additional relief this court deems just, proper, and equitable."

## II.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A plaintiff cannot use a response to a motion for summary judgment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment. See Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff may not amend a complaint through argument in a brief opposing summary judgment); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (same).

A. PLAINTIFF CANNOT RECOVER DAMAGES AGAINST DEFENDANTS FOR THE ALLEGED RLUIPA VIOLATIONS.

Plaintiff seeks damages against defendants in both their official and individual capacities. RLUIPA does not authorize claims for money damages against defendants in their official capacities. Madison v. Virginia, 474 F.3d 118, 133 (4th Cir. 2006). RLUIPA also does not authorize claims for money damages against defendants in their individual capacities. Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009).[11] Accordingly, plaintiff may not recover damages for the RLUIPA claim.

B. EQUITABLE RELIEF IS NOW MOOT.

Plaintiff is no longer housed at ROSP, and thus, equitable relief with respect to his incarceration there is moot. Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007). Plaintiff was transferred from ROSP to a less restrictive facility, and the possibility that plaintiff may re-enter ROSP as a result of an increased security classification due to disruptive behavior and disciplinary convictions is too speculative to find a justiciable claim for injunctive relief.[12] See L.A. v. Lyons, 461 U.S. 95, 105-08 (1983) (holding that Lyons did not have standing to seek an injunction prohibiting the Los Angeles Police Department from employing chokeholds because he could not establish that he would be subjected to a chokehold in the future); O'Shea v. Littleton, 414 U.S. 488, 497 (1974) (holding that no case or controversy existed to issue injunction about the enforcement of criminal laws because it was to be assumed that "[plaintiffs]

---

[11] Rendelman addresses claims for damages against a state or a state official under only the Spending Clause axis of RLUIPA. Plaintiff fails to allege any facts suggesting that his claims against defendants could qualify as actionable claims under the Commerce Clause section of RLUIPA, and I decline to construct the claim for plaintiff.

[12] Equitable relief would still be moot even if plaintiff was transferred back to ROSP. VDOC officials terminated the policy sub judice that required physical possession of evidence documenting a sincere Islamic belief. See Fed. R. Evid. 201(b)-(d) (permitting sua sponte judicial notice of generally known facts within the trial court's territorial jurisdiction at any stage of the proceeding); DePaola v. Wade, No. 7:11-cv-00198, 2012 U.S. Dist. LEXIS 44340, at *7-10 (Wilson, J.) (recognizing in a companion case that the same ROSP Ramadan policy sub judice has changed).

will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners").

C. PLAINTIFF CANNOT RECOVER DAMAGES VIA § 1983 AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES.

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (internal citation omitted). The Eleventh Amendment bars suits in federal courts for money damages against an "unconsenting State." Edelman v. Jordan, 415 U.S. 651, 663 (1974). This immunity extends to "arms of the State," including state agencies and state officers acting in their official capacity. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977); Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995). Virginia has not waived its sovereign immunity and is not a "person" for § 1983 actions. Will, 491 U.S. at 71, 86. Accordingly, plaintiff may not recover damages via § 1983 against defendants in their official capacities.

D. PLAINTIFF MAY NOT RECOVER DAMAGES VIA § 1983 AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES.

Defendants assert that the First Amendment claims asserted against them in their individual capacities are prevented by the doctrine of qualified immunity. Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity provides immunity from suit rather than a mere defense to liability. Thus, whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001),

overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first).

Once a defendant raises the qualified immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right, and the defendant must prove that the right violated was not clearly established at the time of the incident to receive qualified immunity. Henry v. Purnell, 501 F.3d 374, 378 (4th Cir. 2007). "The unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." Lopez v. Robinson, 914 F.2d 486, 489 (4th Cir. 1990). See Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent."). After reviewing plaintiff's allegations, I find that plaintiff fails to show that any defendant violated the First Amendment and that defendants are entitled to qualified immunity.

The Free Exercise Clause of the First Amendment extends to prison inmates. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). However, inmates' First Amendment rights must be evaluated within the context of incarceration. The Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Procunier v. Martinez, 416 U.S. 396, 405 (1974). Thus, I "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006).

This deference is achieved by a rational basis test. I consider four factors to determine if a prison regulation is reasonably related to legitimate penological interests:

> (1) [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Id. at 200 (quoting Turner v. Safley, 482 U.S. 78, 89 92 (1987)). When applying these factors, I must "respect the determinations of prison officials." United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991). The plaintiff bears the ultimate burden of establishing that a prison regulation or decision is unconstitutional. Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir. 1993).

Per this reasonableness test and the principles of qualified immunity, reasonable officials under the circumstances existing at the ROSP in 2010 would not have understood that their conduct of asking for evidence of religious sincerity violated the First Amendment. While plaintiff has a clearly established First Amendment right to a diet consistent with his religious belief, no First Amendment violation occurs when a prison policy is reasonably related to achieving a legitimate penological objective, and prison administrators may question whether a prisoner's religious belief is authentic. See Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005) ("[P]rison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic.").

Defendants were faced with unnecessary, increased costs and administrative burdens in 2009 when ROSP inmates who did not have sincere religious beliefs about Ramadan demanded night-time meals. Defendants' policy of asking for physical evidence of religious sincerity while accommodating prisoners' First Amendment right to participate in Ramadan conforms to

legitimate penological objectives of controlling costs and minimizing operational disruptions. Defendants' decisions to remove plaintiff from the 2010 Ramadan list and to uphold the removal in grievances responses were not punitive or arbitrary, furthered these legitimate penological objectives, and did not violate clearly established, pre-existing law. Prison officials are not liable for making bad guesses in gray areas, and defendants are entitled to qualified immunity.

E.  DECLARATORY RELIEF IS NOT APPROPRIATE.

Plaintiff may not recover damages for his RLUIPA or § 1983 claims, and any equitable relief has been mooted. The absence of legal or equitable remedies to a plaintiff no longer housed at ROSP about a policy that no longer exists persuades me to deny considering declaratory relief for plaintiff's claims. See Centennial Life Ins. Co. v. Poston, 88 F.3d 255, 256 (4th Cir. 1996) (noting that a district court has the discretion to grant declaratory relief "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.").

### III.

For the foregoing reasons, I grant defendants' motion for summary judgment as to plaintiff's federal-question claims, and I decline to exercise supplemental jurisdiction over any state-law claim, pursuant to 28 U.S.C. § 1367(a).

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to plaintiff and counsel of record for defendants.

ENTER: This 30th day of November, 2012.

*/s/ Jackson L. Kiser*
Senior United States District Judge